**Affirmed and Memorandum Opinion filed July 30, 2019.**



In The

# Fourteenth Court of Appeals

## NO. 14-19-00257-CV

## IN THE INTEREST OF K.K.B., A CHILD

**On Appeal from the 313th District Court
Harris County, Texas
Trial Court Cause No. 2015-07296J**

## M E M O R A N D U M   O P I N I O N

Appellant A.G. ("Father") appeals the trial court's final decree terminating his parental rights and appointing the Department of Family and Protective Services as sole managing conservator of his child K.K.B. ("Kate").[1] The trial court terminated Father's parental rights on predicate grounds of failure to support, being criminally responsible for the death or serious injury of a child, constructive abandonment, and knowingly engaging in criminal conduct that resulted in confinement or

---

[1] "Kate" is a pseudonym. Pursuant to Texas Rule of Appellate Procedure 9.8, we use fictitious names to identify the minor and other individuals involved in this case.

imprisonment and inability to care for the child. *See* Tex. Fam. Code Ann. §§ 161.001(b)(1)(F), (L), (N) and (Q). The trial court further found that termination of Father's rights was in the child's best interest. Tex. Fam. Code Ann. § 161.001(b)(2). On appeal, Father challenges the legal and factual sufficiency of the evidence to support the trial court's findings on the predicate grounds and that termination was in Kate's best interest. Because we conclude the evidence is legally and factually sufficient to support the trial court's findings, we affirm the decree of termination.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Pretrial Proceedings

#### 1. *The initial referral and termination of Mother's parental rights*

Kate was born in 2009. She came into the Department's care in 2015 following an incident in which her youngest brother drowned in a bathtub while being supervised by Kate's maternal grandmother and uncle. At the time of the 2015 referral Kate's mother ("Mother") was involved in an ongoing Family Based Safety Services ("FBSS") case involving substance abuse and domestic violence. As part of that case Mother placed the children with the maternal grandmother. At the time of the referral Father had been in prison for five years, having been convicted of aggravated robbery in 2011 and sentenced to 25 years' incarceration.

On June 7, 2017, the trial court terminated Mother's parental rights to Kate and her two younger siblings on grounds of endangerment, constructive abandonment, and failure to comply with a family service plan. Kate has a different father than her younger siblings. Appellant was determined to be Kate's biological father on February 16, 2016. The trial court did not terminate Father's rights at that time and named him possessory conservator of Kate. Kate lived with her siblings

and their adoptive parents.

2. *Motion to modify and termination of Father's parental rights*

On September 18, 2017, the Department filed a motion to modify for conservatorship of Kate. The permanency report notes that modification was sought because Kate demonstrated a need for a stable home. Kate was described as a "very hyperactive and friendly 8 year old" who experienced serious behavioral issues. Kate had "trouble with telling the truth, stealing, following directions, and being outright defiant when she is redirected or told something she does not like."

One year later, on September 27, 2018, the Department amended its motion to request termination of Father's parental rights. The trial court conducted a final hearing on the Department's motion and terminated Father's parental rights.

**B.    Trial**

Before hearing testimony, the trial court admitted into evidence several documents including Kate's birth certificate, an adjudication of Father's parentage, a 2009 judgment of conviction for Father for evading arrest, a 2009 conviction for trespass to property, and Father's 2011 conviction for aggravated robbery with a deadly weapon, for which Father received a 25-year sentence. The documents were admitted without objection.

Sherri Fielder, Kate's therapist, testified that she saw Kate one to two times a week for 45 minutes to an hour either in Kate's foster home or at daycare. Kate resided with the foster family for at least three years before trial. Kate's younger siblings also live with the foster family and have been adopted by them.

In Fielder's initial assessment she testified that Kate suffered from bipolar disorder, Attention Deficit Hyperactivity Disorder ("ADHD"), and oppositional

defiance disorder.[2]  Fielder described Kate's behavior as "extreme" to the degree that Kate could become a flight risk.  Kate has run away from home.  Kate engaged in self-abusive behaviors and had physical alterations with adults and other children. Kate had been progressing in her behavior but began to regress when she started visiting her paternal grandmother ("Grandmother").  Kate regressed when she discovered that she could not "go with her grandmother and father."  Kate's defiant behavior increased because Kate expressed a desire to live with her father and thought she no longer had to listen to the foster family and abide by their rules.

Fielder testified that Kate was most in need of a structured environment with consistency, boundaries, and consequences for breaking the rules or exceeding boundaries.  The foster family was able to handle Kate's behavior.  Kate related well to her siblings.  Kate loved them, and had fun playing with them.  Kate's siblings were adopted by the foster family and their last name was changed to that of the foster family.  Kate expressed to Fielder that she also wants her name to be changed to be included with her siblings.  Kate has lived with the foster family since she was three years old.  Fielder testified that if Kate left the foster family she "would be starting from square one," which would lead to increased defiant behavior.

Fielder clarified that Kate's behavior following visits with Father was not necessarily Father's fault, but Fielder agreed that when Father expressed how much he wanted to be with Kate when he gets out of prison, Kate "gets her hopes up," which caused Kate to act out when she learned she could not live with her father immediately.  To illustrate Kate's aggression, Fielder explained that Kate had attacked "pretty much everyone in [the foster family]'s household physically at one point or another."  Kate attacked her principal and a teacher at school.  Kate's

---

[2] Fielder is not a doctor.  The bases for Fielder's assertions are unclear from the record, but there was no objection.

aggression was "aimed at anyone that's standing in between her and what she wants at the time[.]"

Fielder testified that Kate's negative behavior was driven in part by the perceived possibility that she could live with Father instead of her foster family. In other words, when boundaries were placed on Kate she tried to leave the family where the boundaries were being set. Fielder believed it would be in Kate's best interest to understand that the foster family was her permanent family. Fielder said she spoke to Kate about being adopted and Kate shared that "she has been with [the foster family] since she was 3; so, this is the family that she knows." Fielder was not aware of any other family members who were available to take care of Kate.

Fielder further explained that Kate had "gotten to know the family . . . gotten to know their expectations. She's gotten to know how they run a household and the things that they do. It's exciting for her to be involved in various activities." If Kate left that home, the transition would be difficult and Fielder expressed concern that Kate would need to learn new boundaries and limitations, and her negative behaviors were likely to recur.

The foster mother is Kate's cousin and relative caregiver who has known Kate for most of Kate's life. Kate lived with her previously for a year, and most recently since 2016. The foster mother adopted both of Kate's younger siblings. Kate had special needs and received several services to address those needs, including social skills services to help Kate with her behavior and communication. Kate was receiving "intensive case management." The foster mother described "intensive case management" as "wrap around services, where someone has to come back into the home to help assist with her needs."

Kate has tried to run away from the foster family's home. The foster mother described Kate's most severe behavior as an incident in which Kate attempted

suicide. Kate placed a rope around her neck after receiving a letter from Father "with a bunch of promises." The foster parents immediately took Kate to a psychiatric hospital where she was admitted for several days.

Although Kate's behavior has been difficult, the foster parents were not willing to "give up on her[.]" Kate was described as a very smart child whose behavior impeded her learning. The foster parents wanted Kate to be a part of their family, and they wished to adopt her.

The foster parents have adjusted their lifestyle to care for Kate. When the family goes out they take two cars so that one parent can take Kate home if she creates "a problem or a scene," and the rest of the family can enjoy the outing. The foster family worked with the therapist on strategies to cope with Kate's behavior. The foster mother testified that the Department made the determination that Kate could no longer visit Father, not the foster parents.

Kate's visit with her Grandmother was shortened because Grandmother could not cope with Kate's behavior. Grandmother worked very hard to spend time with Kate but did not have the experience or skills to cope with her behavior. The foster mother agreed that in the future, when Kate matured, visits with Grandmother and Father may be helpful. But, at the time of the final hearing Kate was using her situation to "play one against the other."

Caseworker Courtney Pinnekins testified that she had worked on this case from the beginning. Pinnekins testified that the children came into the Department's care because their fifteen-month-old sibling was left unsupervised in the bathtub and drowned. All four children were living with the maternal grandmother at the time. At the time of the removal Father was serving a 25-year sentence for aggravated robbery. Father would be eligible for parole in 2022. Placement for Kate with Grandmother was approved but the trial court denied the placement because the

6

court did not want the siblings to be separated.

The Department asked that visits and communication be suspended after Father's letter sparked negative behavior in Kate. Pinnekins testified that she spoke with Kate about her desires, and Kate expressed a desire to be adopted by her foster family and to stay with her siblings. Pinnekins testified that adoption was important because Kate will "lose a lot of services that are assisting [Kate] with her behaviors in the home." Pinnekins testified that if Father's rights were not terminated those benefits would be lost. The services, and their funding, were not described in any detail but the record indicates they are provided to Kate through Depelchin Children's Center. Pinnekins also noted that Kate wanted to have the same last name as her siblings and wanted to join that family. Modification and termination of Father's rights would pave the way for Kate's adoption so that she could enjoy a permanent, structured placement and continue to benefit from the services being provided.

On cross examination Pinnekins admitted that she had noted in an earlier permanency report Kate expressed a desire to live with Grandmother. Pinnekins also noted that Kate "will change who she says she wants to live with, depending upon what she thinks she'll get out of it[.]"

Grandmother testified that she had a good relationship with Father who, "just made mistakes as a young man." Grandmother confirmed that Father had been in prison for ten years serving a 25-year sentence for aggravated robbery. Grandmother also noted that Father would be eligible for parole in 2022. Father sent letters and money for Kate to Grandmother. Occasionally Grandmother would pick up Kate from her foster home and spend several days with Kate. Grandmother also took Kate to visit Father in prison.

Grandmother testified that Father has matured during the past ten years in

prison. Father was sixteen or seventeen years old when he was convicted. Grandmother admitted Kate needed a permanent stable family that can address her behavior needs. Grandmother also admitted that she could not provide safe and stable housing for Kate. Grandmother thought it was in Kate's best interest to be safe and cared for and did not "have a problem with her being with the [foster family]."

Kate's maternal grandmother testified that she had known Father for over ten years, including before he went to prison. The maternal grandmother testified that Father had obtained an education and had "been constant in [Kate]'s life." The maternal grandmother did not believe that Father's parental rights should be terminated because "he loves his daughter," and Father provided financial and emotional support for Kate at the time Kate lived with her maternal grandmother. According to the maternal grandmother Father provided financial support by giving money to his mother when she took Kate on outings.

Father testified that Kate was "barely months old" when he went to prison, but that he had contact with her since going to prison. Father "tried to correspond with [Kate] through letters, but her foster parents wouldn't allow it." Father also spoke with Kate on the phone when Kate was at Grandmother's house. Father testified that he regretted the crime that led to the long prison sentence and that he sent Kate, he estimated, between fifty and seventy letters "over the years." Father described his relationship with Kate as "very close." Kate had been to visit Father in prison eight or nine times.

While incarcerated, Father had grown, "mentally, physically, emotionally." Father obtained a General Equivalency Diploma, "was able to complete a trade in horticulture," and was "currently enrolled in college to finish [his] bachelor degree." He also obtained an associate degree in business management and was "working on

8

[his] business administration degree."

When asked why the court should not terminate his parental rights, Father testified that he had learned and matured in prison. Father understood that Kate required services and he wanted her to have that assistance. Father acknowledged that the foster family's home was "sound[,] secure and vibrant," and that Kate required stability and structure. Father was willing to learn what he needed to know to be in his daughter's life. Father felt that Kate "would be devastated" if his parental rights were terminated.

The trial court found that the circumstances of the child conservators, or other party affected by the prior order of termination had materially and substantially changed since the rendition of the prior order. The trial court further found by clear and convincing evidence that Father's rights should be terminated on the predicate grounds of failure to support, being criminally responsible for the death or serious injury of a child, constructive abandonment, and knowingly engaging in criminal conduct that resulted in confinement or imprisonment and inability to care for the child. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(F), (L), (N) and (Q). The trial court further found that termination of Father's rights was in Kate's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2).

## II. ANALYSIS

### A. Standards of Review

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Although parental rights are of constitutional magnitude, they are not absolute. *In re A.C.*, No. 17-0477, ___ S.W.3d ___, 2018 WL 5304691, at *3 (Tex. Oct. 26,

9

2018); *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.").

Due to the severity and permanency of terminating the parental relationship, Texas requires clear and convincing evidence to support such an order. *See* Tex. Fam. Code Ann. § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *In re J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a "correspondingly searching standard of appellate review." *In re A.C.*, 2018 WL5304691, at *4; *see In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

In a proceeding to terminate the parent-child relationship brought under section 161.001 of the Texas Family Code, the petitioner must establish, by clear and convincing evidence, one or more acts or omissions enumerated under subsection (1) of section 161.001(b) and that termination is in the best interest of the child under subsection (2). Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

In reviewing legal sufficiency of the evidence in a parental termination case, we must consider all evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). We assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence that a reasonable fact finder could have disbelieved. *Id*.; *In re G.M.G.*, 444 S.W.3d 46, 52 (Tex. App.—Houston [14th

Dist.] 2014, no pet.). However, this does not mean that we must disregard all evidence that does not support the finding. *In re D.R.A.*, 374 S.W.3d at 531. Because of the heightened standard, we also must be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id*.

In reviewing the factual sufficiency of the evidence under the clear-and-convincing burden, we consider and weigh disputed evidence contrary to the finding against all the evidence favoring the finding. *In re A.C.*, 560 S.W.3d at 631; *see In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.O.A.*, 283 S.W.3d at 345. We give due deference to the fact finder's findings and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

## B. Predicate Grounds

In his first four issues Father challenges the legal and factual sufficiency of the evidence to support the trial court's findings on the predicate grounds for termination. Only one predicate finding under section 161.001 is necessary to support a judgment of termination when the fact finder also finds that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). In its brief, the Department concedes the evidence is insufficient as to the predicate grounds under subsections 161.001(b)(1)(L) and (N), and the Department does not seek to affirm the judgment on those grounds. As to section 161.001(b)(1)(F), the Department does not concede that the evidence is insufficient to support the predicate finding under that section, but it does not brief the issue. The Department presents argument and authority in support of the termination finding only under

11

section 161.001(b)(1)(Q). We will address the trial court's finding under section 161.001(b)(1)(Q).

Subsection (Q) "fills a gap" in the bases for termination by allowing a prospective analysis of the anticipated care of a child while the parent is incarcerated and an opportunity for intervention to avoid neglect of a child during a prolonged incarceration. *See In re A.V.*, 113 S.W.3d at 360. The provision exists not to punish parents for their criminal conduct, but to "ensure that the child will not be neglected" while his or her parent is away in prison. *Id.* The primary focus of subsection (Q)— like section 161.001 generally—is the protection of the child's best interests. *Id*.

The Department was required to prove by clear and convincing evidence that Father knowingly engaged in criminal conduct that has resulted in Father's (1) conviction of an offense, and (2) confinement or imprisonment and inability to care for the child for not less than two years from the date on which the Department filed the termination petition. *See* Tex. Fam. Code § 161.001(b)(1)(Q); *In re A.V.*, 113 S.W.3d at 360 (construing phrase "two years from the date of filing the petition" to apply prospectively from the date of filing a petition); *In re B.M.R.*, 84 S.W.3d 814, 817 (Tex. App.—Houston [1st Dist.] 2002, no pet.). In *A.V.*, the Supreme Court of Texas held that section 161.001(b)(1)(Q) applies prospectively and stated that "if the parent is convicted and sentenced to serve at least two years and will be unable to provide for his or her child during that time, the State may use subsection Q to ensure that the child will not be neglected." *In re A.V.*, 113 S.W.3d at 360.

It is undisputed that Father was convicted of an offense. The evidence admitted at trial contains the judgment reflecting Father's felony conviction for aggravated robbery. The judgment sentenced Father to twenty-five years in prison beginning October 14, 2011.

The Department filed an amended motion to modify seeking termination of

Father's rights on September 27, 2018. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(Q); *In re A.V.*, 113 S.W.3d at 360. Therefore, under subsection Q, the Department was required to prove that Father will be confined or imprisoned and unable to care for Kate until September 27, 2020. Father's release date is October 14, 2036, well beyond the two-year requirement under subsection Q.

In addressing the manner in which an appellate court should review a finding that a parent's criminal conduct would result in the parent's confinement or imprisonment for not less than two years from the date on which the termination petition was filed, the Supreme Court of Texas has provided the following guidance:

> We recognize that a two-year sentence does not automatically meet subsection Q's two-year imprisonment requirement. In some cases, neither the length of the sentence nor the projected release date is dispositive of when the parent will in fact be released from prison. A parent sentenced to more than two years might well be paroled within two years. Thus, evidence of the availability of parole is relevant to determine whether the parent will be released within two years. Mere introduction of parole-related evidence, however, does not prevent a factfinder from forming a firm conviction or belief that the parent will remain incarcerated for at least two years. Parole decisions are inherently speculative, and while all inmates doubtless hope for early release and can take positive steps to improve their odds, the decision rests entirely within the parole board's discretion.

*In re H.R.M.*, 209 S.W.3d at 109-10 (citations omitted).

Although Father is not scheduled for release until 2036, Father argues that he could be released on parole in 2022. However, that date is still well after September 18, 2020. Father is not entitled to be released on parole prior to 2022, and he makes no argument that he could be released before that year.

The requirement of clear and convincing evidence of an "inability to care for the child" is not met on the mere showing of prolonged incarceration. *In re I.W.*, No. 14-15-00910-CV, 2016 WL 1533972, at *4 (Tex. App.—Houston [14th Dist.]

13

Apr. 14, 2016, no pet.) (mem. op.); *In re B.M.R.*, 84 S.W.3d 814, 818 (Tex. App.—Houston [1st Dist.] 2002, no pet.). Therefore, evidence of a two-year incarceration is only the first step in the analysis. *In re J.G.S.*, 574 S.W.3d 101, 118-19 (Tex. App.—Houston [1st Dist.] 2019, no pet. h.). If the Department shows that the parent will be incarcerated for more than two years from the date on which the termination petition was filed, the burden of production shifts and the parent must then produce some evidence of how the parent will provide care for the child during the period of confinement or that the parent has arranged with another person for that person to provide care for the child during the period of confinement. *Id*. If the parent seeks to meet the burden of production with evidence that another person will care for the child during the period of confinement, the parent must prove the proposed caregiver's agreement to provide care. *In re E.S.S.*, 131 S.W.3d 632, 640 (Tex. App.—Fort Worth 2004, no pet.) ("Appellant met his burden of production regarding how he would arrange for the care of E.S.S. in that the agreement reached by the parties included naming Appellant's mother and brother possessory conservators with visitation rights.").

An incarcerated parent cannot meet his burden merely by producing evidence that there is an unincarcerated parent or grandparent who is willing and able to care for the child; instead, the parent must present evidence that the alternative caregiver is providing care on behalf of the parent. *In re H.R.M.*, 209 S.W.3d at 105; *see In re D.Z.R.-M.*, No. 14-13-01084-CV, 2014 WL 1390289, at *9 (Tex. App.—Houston [14th Dist.] Apr. 8, 2014, no pet.) (mem. op.) (holding that evidence of aunt's care did not meet father's burden because aunt's care was "on her own behalf, rather than agreeing to assume the Father's obligation to care for the Child while the Father is incarcerated," and alternatively holding that, even if father met burden, Department met its subsequent burden).

14

In attempting to meet his burden of production Father argues that Grandmother could support Kate while he is in prison. He presented no evidence, however, that Grandmother had agreed to care for Kate on his behalf or had the means to do so. *See In re H.R.M.*, 209 S.W.3d at 110. Grandmother testified that she was unable to provide a safe and stable home for Kate.

If the parent's burden of production is met, the burden then shifts again to the party seeking to terminate parental rights. *In re J.G.S.*, 574 S.W.3d at 119-120. That party then has the burden of persuasion to show by clear and convincing evidence that the parent's provision or arrangement would not adequately satisfy the parent's duty to the child. *Id.* Because Father did not meet his burden of production under the second step we do not address the third step.

Considered in the light most favorable to the trial court's finding, the evidence is legally sufficient to support the trial court's determination that termination of Father's parental rights was justified under Family Code section 161.001(b)(1)(Q). Further, in view of the entire record, we conclude the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination was warranted under section 161.001(b)(1)(Q). Accordingly, we conclude the evidence is factually sufficient to support the 161.001(b)(1)(Q) finding.

Having concluded the evidence is legally and factually sufficient to support the trial court's finding under subsection Q, we need not review the sufficiency of the evidence to support the findings under subsections F, L, and N. *See In re A.V.*, 113 S.W.3d at 362. We overrule Father's fourth issue and do not reach his first three issues.

## B.    Best Interest of the Child

In Father's fifth issue, he challenges the legal and factual sufficiency of the

evidence to support the trial court's finding that termination of his parental rights is in Kate's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2).

The best-interest inquiry is child-centered and focuses on the child's well-being, safety, and development. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). The trier of fact may consider several factors to determine the child's best interest, including: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *In re E.R.W.*, 528 S.W.3d 251, 266 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *see also* Tex. Fam. Code Ann. § 263.307(b) (listing factors to consider in evaluating parents' willingness and ability to provide the child with a safe environment).

Courts apply a strong presumption that the best interest of the child is served by keeping the child with the child's natural parents, and it is the Department's burden to rebut that presumption. *In re D.R.A.*, 374 S.W.3d at 531. Prompt and permanent placement in a safe environment also is presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a). A finding in support of "best interest" does not require proof of any unique set of factors, nor does it limit proof to any specific factors. *See Holley*, 544 S.W.2d at 371-72.

1. **The desires of the child**

Kate was nine years old at the start of trial. The record reflects Kate's

conflicting desires. The foster mother and the caseworker testified that Kate expressed a desire to live with the foster family. Kate wanted to be adopted and have the same last name as her siblings. Father testified that Kate wanted to live with him.

A child's love for her parent is "a very important consideration in determining the best interest of the children," although it cannot override or outweigh evidence of danger to the child nor can it compensate for the lack of an opportunity to grow up in a normal and safe way equipped to live a normal, productive, and satisfying life. *In re F.M.E.A.F.*, 572 S.W.3d 716, 732 (Tex. App.—Houston [14th Dist.] 2019, pet. filed) (quoting *In re K.L.P.*, No. 14-18-00582-CV, 2018 WL 6684275, at *10 (Tex. App.—Houston [14th Dist.] Dec. 20, 2018, pet. denied) (mem. op.)).

This factor weighs slightly in favor of termination.

### 2. Present and future physical and emotional needs of the child and present and future physical and emotional danger

"Regarding this factor, we note that the need for permanence is a paramount consideration for the child's present and future physical and emotional needs." *In re D.R.A.*, 374 S.W.3d at 533. Establishing a stable, permanent home for a child is a compelling government interest. *Id.* This factor, along with the availability of programs to meet Kate's physical, emotional, and therapeutic needs, are particularly important factors given the circumstances of this case.

The record reflects that Kate has special emotional needs that require a stable permanent home. Kate's foster mother reported that Kate requires "intensive case management," including regular therapy appointments and help with social skills. Kate purportedly has bipolar disorder, ADHD, and oppositional defiance disorder. Services are provided to Kate to address those issues and will continue if she is adopted by the foster family. Fielder provides twice-weekly individual therapy

17

sessions including Trauma Focus Cognitive Behavioral therapy.  Pinnekins testified that if Father is continued as the possessory conservator those services will not continue.

As noted above, the record reflects that Kate's behavior worsened when she thought she would be able to live with Father.  Kate's therapist noted that Kate needs a permanent stable home and to "understand what her primary family is and who's primarily responsible for her and who she is primarily accountable to."

Father's assertion that it is "speculative" whether Kate's future physical and emotional needs will be met by the foster family is contrary to the record.  The foster family adopted Kate's siblings and is willing to adopt her.  The foster family learned to cope with Kate's disruptive behavior and is committed to helping Kate manage her behavior.  This factor supports the best-interest finding.

3.    **Parental abilities of those seeking custody, stability of the home or proposed placement, and plans for the child by the individuals or agency seeking custody**

These related factors compare the Department's plans and proposed placement of the child with the plans and home of the parent seeking to avoid termination of the parent-child relationship.  *See In re D.R.A.*, 374 S.W.3d at 535.

Father does not dispute that the foster family was able to provide for Kate's needs.  The caseworker testified that caring for Kate "can be trying" but that the foster parents worked consistently with Kate to get her the therapy she needed.

To be sure, Father made laudable efforts while incarcerated to improve the chances that he will be able to provide for himself and for his children in the future. For example, he completed his GED, learned a "trade in horticulture," and obtained an associate degree in business management.  Despite those efforts, the record reflects Father was unable to provide Kate with the permanency and stability she

needed and that the foster family could provide. The record further reflects that Kate's contacts with Father affected her behavior in a negative manner. Kate would regress because she did not understand that she could not immediately move in with her father. Both the caseworker and therapist testified that this emotional limbo was not in Kate's best interest. This factor weighs in favor of termination. As circumstances stand, the fact finder reasonably could have formed a firm belief or conviction that the benefits of foster placement and adoption outweigh any potential that Father will be able to provide for Kate at least until September 2020 and into the foreseeable future.

4.    **Programs available to assist those individuals seeking custody to promote the best interest of the child.**

This factor is one of the more important factors in the analysis with regard to Kate. Kate needs consistent therapy, medication, and attention to her behavioral issues. Pinnekins testified that Kate could lose these services without termination of Father's parental rights and adoption. Father cannot provide any of these services from prison. Father argues on appeal that Grandmother could care for Kate while he is in prison. Grandmother testified, however, that she was unable to provide a stable safe home for Kate.

Kate's foster parents are relatives who understand the progress Father has made while in prison. The foster mother testified that she was "open to [Kate] visiting with her paternal side of the family." The record reflects that termination of Father's parental rights would free Kate to be adopted by her foster parents and provide her with the therapeutic services and permanency she needs. The foster parents are open to contact with Father so long as Kate's emotional trauma is not triggered by such contact.

**5.    Acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate and any excuses for acts or omissions.**

We finally consider Father's acts or omissions and any excuses for his acts or omissions. Father was incarcerated shortly after Kate was born. In addition to Father's conviction for aggravated robbery, the record reflects Father was convicted of evading arrest or detention and trespass to property in 2009. The trial court was entitled to consider Father's criminal history, including incarceration, to support the finding that termination was in Kate's best interest as an act indicating the existing parent-child relationship is not appropriate. *See e.g., In re C.H.*, 89 S.W.3d at 28 (considering father's extensive criminal history as part of acts or omissions analysis and noting evidence under section 161.001(b)(1) may also be considered in best interest analysis); *In re S.N.*, 287 S.W.3d 183, 193 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (considering appellant's incarceration for a suspended driver's license at the time his children were removed and later 18-day incarceration for outstanding traffic violations as acts or omissions relevant to best interest analysis). Father did not present an excuse for his illegal conduct, although he admitted he made a mistake. This factor weighs in favor of termination.

### III.    CONCLUSION

The evidence is legally and factually sufficient to support the predicate termination finding under subsection Q. Based on the evidence presented, the trial court reasonably could have formed a firm belief or conviction that terminating Father's parental rights was in the child's best interest so that she could promptly achieve permanency through adoption.

We affirm the decree terminating Father's parental rights and naming the Department managing conservator.

/s/     Kevin Jewell
        Justice

Panel consists of Justices Wise, Jewell, and Hassan.